# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**GENERAL ELECTRIC COMPANY**

**CIVIL ACTION**

**VERSUS**

**NO. 16-449-JWD-RLB**

**WEST FELICIANA PARISH HOSPITAL**
**SERVICE DISTRICT NO. 1**

## RULING AND ORDER

This matter came before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. 6) and Defendant's Motion to Dismiss (Doc. 15). The Court heard oral arguments on October 26, 2016, at which time it exercised its authority under Federal Rule of Civil Procedure 12(d) to convert the Motion to Dismiss to a Motion for Summary Judgment,[1] and permitted the parties ten days to submit post-hearing briefs and supplement the record with evidence for the Court to consider in its Ruling. (*See* Doc. 28.) After considering the parties' arguments, the unique factual circumstances of this case, and the relevant jurisprudence, for the reasons stated below, the Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Preliminary Injunction is **DENIED**.

## I.    Factual Background

General Electric Company's Healthcare Division ("Plaintiff") is a New York corporation headquartered in Fairfield, Connecticut with its principle place of business in Chicago, Illinois. (Doc. 3 at 1—2.) West Feliciana Parish Hospital Service District No. 1 ("Defendant") is a political

---

[1] Pursuant to Rule 12(d), when the Court considers matters outside the pleadings on a motion to dismiss, it may convert the motion to one for summary judgment, and dispose of it in accordance with Rule 56. *See Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1283-84 (5th Cir. 1990) (citing *Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972)); *Jackson v. Procunier,* 789 F.2d 307, 310 (5th Cir.1986); *see also Curry v. Miss. Dept. of Corr's*, 586 F. App'x 165, 166 (5th Cir. 2014).

subdivision of the State of Louisiana. *Id.* at 2. On December 17, 2015, Defendant publicized an Invitation for Bids, Project No. 2015-0001, for qualified vendors to provide specified medical equipment. *Id.* Three bids were received timely, including a bid by Plaintiff. *Id.* at 3. On February 4, 2016, Defendant rejected all three bids due to alleged deficiencies. *Id.* Plaintiff subsequently learned its bid was rejected because it failed to acknowledge Addendum No. 1 to the IFB; in other words, it failed to write the number "1" on the bid form. *Id.* Had Plaintiff complied with this requirement, it would have been awarded the bid; nonetheless, understanding the highly technical nature of Louisiana's Public Bid Law, it did not contest Defendant's rejection of its bid. *Id.*

On February 11, 2016, Defendant advertised an invitation for bid, for Project No. 2016-0001-A (the "IFB"), for qualified vendors to provide state-of-the-art imaging equipment consisting of a MRI; CT Scanner; X-Ray Unit General RAD, Digital; and X-Ray Unit, RAD, Fluoro, Digital (the foregoing, collectively, the "Equipment"), including all components and services necessary to seamlessly integrate the Equipment with Defendant's other day-to-day clinical and business software and systems. (*Id.* at 4.) Defendant issued multiple addenda to the IFB, to update interested parties of modifications to the IFB, schedule of events, and specifications for the Equipment. *Id.* Defendant specifically stated in the IFB and in Exhibit A "that the equipment specifications were used only to denote the quality and standard of the product desired, and that the equipment specifications did not restrict bidders to the specific brand, make, manufacturer, or specification named" and that equivalent products were acceptable. (Doc. 15 at 2.)

On the same day the IFB was advertised, Defendant published Addendum No. 1 advising interested bidders that Exhibit A, Equipment Specifications, would be released via a separate addendum. *Id.* On February 16, 2016, Defendant published Addendum No. 2 providing interested bidders with Exhibit A, Equipment specifications. *Id.* On February 25, 2016, Defendant published

Addendum No. 3, which provided interested bidders with an updated Exhibit A-1, Equipment Specifications, which, by its terms, superseded the Exhibit A that was previously provided to interested parties via Addendum No. 2 and further modified the Schedule of Events. *Id.*

Plaintiff claims these revisions to Exhibit A-1 helped Hitachi Medical Systems of America ("Hitachi") become more responsive to the IFB by removing several of the specifications that Hitachi was unable to meet in the previous round of bidding in 2015. *Id.* at 4, 6. Further, Plaintiff, in its complaint, points to a litany of specifications which it claims Hitachi failed to meet or exceed, and which thereby rendered Hitachi's bid nonresponsive.[2]

---

[2] Specifically, Plaintiff notes that, like the specifications of the 2015 bidding, Exhibit A-1 still included the following Equipment specification for the MRI equipment:

> • T/R Body Coil and T/R Head Coil: System to include a transmit-and-receive RF body coil and a split-top transmit-and-receive RF head coil. The RF body coil is integrated into a single module with the gradient coil, which is both water and air cooled.

*Id.* at 5 (quoting the IFB, Ex. A-1). Plaintiff claims that under the 2015 round of bidding, Hitachi responded to the same equipment specification by stating: "Equivalent. T/R quadrature body coil Multi-channel head coil (receive only)." However, it argues this was disingenuous because "[t]he 'receive only' head coil Hitachi proposed did not meet or exceed the 'transmit and receive' head coil MRI Equipment specification at that time." *Id.* Under the 2016 round of bidding, Hitachi responded to the above specification by stating "Equivalent" but further stated the T/R Body Coil was included, but the T/R Head Coil was not required. *Id.* at 7. Plaintiff claims Hitachi's assertion that the T/R Head Coil was "not required" was actually an admission that its product did not meet a material specification, and therefore its bid was nonresponsive. *Id.*

Additionally, Plaintiff asserts that Exhibit A-1 included the same MRI receiver dynamic range specification as the prior iterations of Exhibit A, specifically: "1 Hz BW: > 165db." *Id.* at 9. Hitachi responded to this same specification under the 2015 round of bidding by asserting equipment was "Equivalent" even though it acknowledged its proposed equipment only reached 700 kHz (or 0.7 Hz), which rendered its equipment 30% below the minimum standard set by Defendant's bid. *Id.*

Plaintiff also cites Exhibit A-1's specification that the MRI's receiver resolution "must be able to reach or exceed a resolution of 32 bits." *Id.* at 10. This was the same requirement placed on the MRI receiver in the 2015 bidding, to which Hitachi responded its equipment was "Equivalent" while acknowledging its proposed equipment only reached 16 bits. In its March 2016 bid proposal, Hitachi once again asserted its equipment was "Equivalent" despite the fact it only reached 16 bits. *Id.*

Next, Plaintiff points to Defendant's specifications for the Chemical Shift Direction Selection, which mirrored the previous iterations of Exhibit A, and which required the bidder's equipment to contain this function. *Id.* at 11. In both its 2015 and 2016 bid proposals, Hitachi responded that the Chemical Shift Direction Selection specification was "Not Available." *Id.*

Additionally, Plaintiff notes that Exhibit A-1 included the same X-ray beam shape correction specifications for the CT Scanner equipment as the prior two iterations of Exhibit A, specifically that the equipment must possess capabilities equal two, or better than: "[a]utomatic and continuous correction of X-ray beam shape to block unused x-ray at beginning and end of helical scan." *Id.* at 12 (quoting IFB's Ex. A-1). Hitachi offered instead a lateral shifting patient table, equipment that allegedly exceeded this specification (although GE maintains this equipment is materially different from the specifications, and thus does not meet or exceed same). *Id.* at 12-13. Finally, Plaintiff cites Exhibit A-1's image file storage specifications for the CT scanner, which mirrored the prior two versions of Exhibit A, and which matched the same specifications in the 2015 round of bidding. *Id.* at 14. The

Bidders were required to submit bids electronically no later than 1:00 p.m. on March 7, 2016. *Id.* Defendant received three timely bids on March 7, 2016: (i) Hitachi's bid in the amount of $2,165,900; (ii) GE's bid in the amount of $2,396,763.66; and (iii) Siemens Medical Solutions USA's bid in the amount of $2,587,023. *Id.* Philips Healthcare submitted a bid after 1:00 p.m., which Defendant refused to consider because it was untimely. *Id.*

Defendant submitted Hitachi's apparent low bid to Defendant's evaluation committee to determine whether Hitachi's proposed equipment was, in the opinion of the evaluation committee, equivalent to the Equipment specifications set forth in Exhibit A-1 to the IFB. (Doc. 15-1 at 3.) On April 22, 2016, Defendant awarded Hitachi the contract for the Equipment in response to the IFB. *Id.* at 4. On June 6, 2016, Defendant executed purchase agreements with Hitachi for the Equipment, at which time Hitachi began performance under the contract, including commencement of production of the equipment and meeting with Defendant's design team to ensure the plans and specifications fit Defendant's layout. *Id.* at 4.

On May 5, 2016, Plaintiff, via counsel, filed a formal protest letter with the Office of State Procurement ("OSP") and sent a copy to Defendant. (Docs. 15-1 at 3; 42-1 at 1.) The seven and a half page letter contained several detailed allegations of the deficiencies in Hitachi's bid proposal, many of which mirrored the allegations in Plaintiff's complaint (*see* Docs. 42-1 at 3—7; 3 at 5—15), and asserted that because Hitachi's bid was nonresponsive, Plaintiff actually submitted the lowest responsive and responsible bid and therefore must be awarded the contract. (Doc. 42-1 at 1, 7—8.)  Plaintiff's letter to the OSP concluded:

---

equipment specification stated "the CT Scanner shall have, or exceed, '350,000 uncompressed 512 x [51]2 image file storage and 3,250 scan rotations or 1,500 scan data files, or up to 300 exams.'" In both its 2015 and 2016 bid proposals, Hitachi responded that its equipment, the Scenaria 128 SE CT Scanner, met the specifications and was capable of "300,000 uncompressed 512 x 512 images, plus 4,700 scan rotations, plus 9.4GB removable DVD's that store 16,000 images each." *Id.* (quoting Hitachi's bid proposal).

Hitachi's bid is *non-responsive as a matter of law*… Hitachi was improperly awarded the contract. Now that their failure to supply a legally responsive bid is known to the Hospital, that error cannot stand. Hitachi's bid must be rejected as non-responsive, and GE Healthcare, as the lowest responsive and responsible bidder, must be awarded with the contract.

(Doc. 42-1 at 7—8 (emphasis added).)

The OSP subsequently responded to counsel's letter informing Plaintiff it lacked jurisdiction over its claim. *Id.* On May 24, 2016, counsel for Defendant sent a letter to Plaintiff that reiterated that the OSP had no jurisdiction over the IFB. (*Id.*; Doc. 6-2 at 1—3.) The letter further stated:

[a]fter a thorough evaluation of the equipment specifications bid by [Hitachi] against the specifications set forth on Exhibit A-1 to the IFB, Project No. 2016-0001-A, the Hospital determined that the HMSA equipment substantially met, and therefore was the functional equivalent of, the Equipment Specifications set forth on Exhibit A-1 of IFB, Project No. 2016-0001-A. The Hospital further determined that [Hitachi's] proposed equipment fulfilled the required functionality to provide the necessary services to patients presenting at the Hospital. Consequently, Hospital awarded [Hitachi], as the lowest, most responsive and responsible bidder, the contract for the Equipment in response to IFB, Project No. 2016-0001-A.

(Doc. 6-2 at 2.)

On July 5, 2016, approximately eleven weeks after it first learned it had not been awarded the contract, Plaintiff initiated this litigation. (*See* Doc. 1.) In its Amended Complaint, filed on July 13, 2016, Plaintiff demanded four kinds of relief: (1) a permanent injunction enjoining performance under the contract between Defendant and Hitachi; (2) a declaratory judgment declaring the award of the bid to Hitachi as violative of the Louisiana Public Bid Law; (3) a writ of mandamus directing Defendant to award it the 2016 bid, as Plaintiff was the lowest responsible and responsive bidder; and (4) damages, costs, and attorneys' fees. (Doc. 3 at 15—19.) Subsequently, on July 22, 2016, Plaintiff filed for a preliminary injunction seeking to enjoin performance under the contract between Hitachi and Defendant. (Doc. 6.)

Plaintiff requested Defendant waive service of summons, thereby allowing Defendant sixty days to file its answer pursuant to Rule 12.[3] Defendant signed the waiver on July 8, 2016 and Plaintiff filed the returned waiver of service into the record on July 13, 2016. (Doc. 4.) At no time did Plaintiff file for a temporary restraining order, nor did it request an expedited hearing on its motion for preliminary injunction. The parties requested a continuance of the Magistrate Judge's scheduling conference from September 15, 2016 to September 22, 2016. (Doc. 17.) After hearing on the instant motions was set for October 26, 2016 (Doc. 18), the scheduling conference with the Magistrate Judge was reset for November 3, 2016 without objection from either party. (Doc. 19.) The Court heard oral arguments on Plaintiff's Motion for Preliminary Injunction and Defendant's Motion to Dismiss on October 26, 2016. Based on factual representations made by both parties in briefing and in argument for which there was no support in the record and based on evidence which was produced, the Court gave notice of its intention to convert the Motion to Dismiss to a Motion for Summary Judgment and permitted the parties an additional two weeks to supplement the record with additional evidence for the Court to consider in its Ruling. (Doc. 28.) Post-hearing briefs were submitted to the Court by both parties on November 9, 2016. (Docs. 42—43.)

## II.    Parties' Arguments

### a.    Defendant's claims

In its initial motion before this Court, Defendant argued dismissal is appropriate for several reasons. First and foremost, Defendant argued that Plaintiff's request for a permanent injunction was untimely filed, and therefore Plaintiff waived its right to all the remedies it seeks in its amended complaint, including the permanent injunction, declaratory judgment, writ of mandamus,

---

[3] Under Federal Rule of Civil Procedure 12(a)(1), Defendant would have been required to file its Answer within twenty-one days if Plaintiff had not requested a waiver of service of summons. By requesting such waiver, the window in which Defendant had to file its Answer increased to sixty days.

and damages. (Doc. 15-1 at 1.) Additionally, with regard to the declaratory judgment, Defendant asserts that Plaintiff failed to satisfy the condition precedent to request a declaratory judgment pursuant to La. Rev. Stat. Ann. § 38:2220.2. *Id.* at 1-2.

Citing *Airline Construction v. Ascension Parish School Board*, 568 So.2d 1029, 1035 (La. 1990), and its progeny, Defendant argues Plaintiff has waived its right to relief because its Amended Complaint failed to justify its untimely filing. *Airline* explicitly held that "[i]f an aggrieved bidder does not timely file suit for injunction, he has waived any right he may have… against the public body…" 568 So.3d at 1035. Noting the timeliness of a suit for injunctive relief depends on the unique facts and circumstances of each case, Defendant asserts that the facts of this case render Plaintiff's suit untimely.

Defendant contends Plaintiff likely learned of the award of the contract to Hitachi as early as April 22, 2016, and it definitely became aware that Hitachi won the bid on April 28, 2016, when Plaintiff's in-house counsel received an email notifying it that Hitachi was the lowest responsive bidder. (Doc. 15-1 at 11.) Defendant notes that Plaintiff took formal action on May 5, 2016, when it contacted the OSP via a protest letter to complain of the alleged violation of the Louisiana Public Bid Law. However, Plaintiff waited an additional 61 days after formally complaining to the OSP (and 42 days after receiving notification from counsel that OSP did not have jurisdiction over the subject-matter of Plaintiff's complaint) before filing suit. Defendant further argues Plaintiff failed to act timely when it requested a waiver of service from Defendant (Doc. 4), which thereby allowed Defendant 60 days to file an answer, rather than the 21 days that it would have otherwise had without the waiver. (Doc. 15-1 at 11.) Based on this, Defendant claims that "under *Airline* and its progeny, GE's unjustified failure to timely seek an injunction constitutes a waiver of GE's ability to seek any sort of relief—injunctive or otherwise—against the Hospital." *Id.*

Additionally, Defendant maintains that even if the Court declines to dismiss the case on timeliness grounds, independent grounds demonstrate Defendant is entitled to judgment.[4] (Doc. 15-1 at 12.) Defendant alleges Plaintiff has not made the requisite showing to entitle it to an injunction because it failed to allege all of the following elements required for a successful claim for injunctive relief: a high likelihood of success on the merits; a substantial threat that without such injunction, Plaintiff will suffer irreparable injury; that the threatened harm outweighs the damage an injunction would cause defendants; and that the injunction will not impair public interest. (Doc. 15-1 at 12 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 442 (5th Cir. 2000); *Isaac v. Louisiana Dep't of Children & Family Servs.*, No. 15-13, 2015 WL 4078236 at *5 (M.D.La. July 6, 2015).)

Further, Defendant avers Plaintiff's request for a writ of mandamus should be denied because in order to demonstrate entitlement to mandamus relief, a plaintiff must demonstrate, *inter alia*, that mandamus is the only available remedy or that the delay caused by another remedy would be an injustice to the plaintiff. (Doc. 15-1 at 16 (citing *Reg'l Transit Auth. v. Kahn*, 99-2015 (La. App. 4 Cir. 8/26/99), 724 So.2d 960, 964).) Defendant asserts that Plaintiff's other requests for relief, including its request for money damages, undermines the viability of its request for mandamus, as there are clearly other remedies available to Plaintiff. (Doc. 15-1 at 17.) Defendant also maintains that Plaintiff's request for a declaratory judgment should be dismissed because Plaintiff did not notify the Attorney General of the alleged violation, as required by statute. (Doc. 15-1 at 18 (citing La. Rev. Stat. Ann. § 38:2220.3(A)).) Finally, Defendant argues that Plaintiff has failed to allege sufficient facts to support an award of monetary damages. (*See* Doc. 15-1 at 18—19.)

---

[4] Because the Court finds Defendant's argument concerning timeliness entitles it to summary judgment, the Court will briefly summarize the remainder of Defendant's arguments.

In its supplemental post-hearing memorandum, Defendant reiterates its position that Plaintiff's claims are untimely under *Airline*, and argues Plaintiff had actual knowledge in early May 2016 of the alleged deficiencies in Hitachi's bid, as evidenced by the detailed protest letter Plaintiff sent to the OSP attached to Defendant's brief. (Docs. 42 at 2; 42-1 at 1—8.) Defendant cites several quotes from Plaintiff's letter, including Plaintiff's allegations that "Hitachi deviated from the specifications in multiple respects"; that "Hitachi was improperly awarded the contract"; and that "Hitachi's bid is non-responsive as a matter of law", and based on these assertions, argues that "Plaintiff had all the knowledge it needed to pursue a claim as early as May 6, 2016." (Doc. 42 at 3.)

Additionally, Defendant supports its allegation that Plaintiff had all the requisite knowledge to make its claim that Hitachi's bid was nonresponsive by pointing to the seven-page table that Plaintiff attached to its protest letter. *Id.* The table compares the bids submitted by Hitachi for a previous IFB and for the bids Hitachi submitted in connection with the IFB that is the subject of this litigation. This table, argues Defendant, "includes at least [fifteen] categories of alleged issues with Hitachi's bid and over 40 rows detailing the alleged issues with Hitachi's bid." (Doc. 42 at 3 (citing Doc. 42-1 at 9—15).) Defendant notes that the table contains a column entitled "GE Healthcare Note" which outlines Plaintiff's position as to each specification listed, and Defendant concludes that the information contained in Plaintiff's letter to the OSP and the table attached thereto "is virtually identical to the allegations of the Amended Complaint (Doc. 3) in this litigation at paragraphs 35-106." (Doc. 42 at 4.) Finally, Defendant points to the seventeen files Plaintiff attached to its letter, which consisted of Hitachi's documents relating to various pieces of equipment for the IFB and other documents relevant to Hitachi's bid proposal, which Defendant provided to Plaintiff in March 2016. "[B]ased on the foregoing, [Defendant concludes that]

Plaintiff possessed a vast amount of knowledge relating to the issues that it now claims that Hitachi's bid suffers from, including Hitachi's bid documents" and its failure to initiate litigation until July 2016 when it had all relevant information in March 2016 renders its complaint and request for injunctive relief untimely. (Doc. 42 at 5.)

Although Defendant argues that Plaintiff clearly and indisputably had knowledge of the alleged deficiencies in Hitachi's bid when it wrote the protest letter to the OSP on May 6, 2016, it nonetheless contends that Plaintiff likely knew of the relevant information much earlier, probably as early as March 16, 2016. (Doc. 42 at 5.) In support of this assertion, Defendant attaches to its brief the Declaration of Lori Griffin, Defendant's purchasing agent. (Doc. 42-2.) In her Declaration, Griffin avers that on March 7, 2016, she compiled all the bids Defendant received in response to its IFB. (Doc. 42-2 at 1.) Shortly thereafter, Griffin notified representatives from each bidding party, attaching the bid tabulation for all the bids Defendant received. Griffin notified Plaintiff through an email addressed to Justin Panter, Account Manager for VasoHealthcare Sales Professionals, an authorized manufacturer representative for Plaintiff. (Doc. 42-2 at 1—2.) Approximately one week later, on March 16, 2016, Griffin received an email from Panter specifically requesting the details of Hitachi's bid, noting he was not able to access it without her assistance. (Doc. 42-2 at 2.) Approximately two hours after Griffin received this email, she responded to Panter's request for information and advised him she would provide him with all of Hitachi's documents in four separate emails.[5] *Id.* Defendant notes that many of these documents were used to provide the substance of Plaintiff's protest letter to the OSP, as well as its complaint here. (Doc. 42 at 5.) In sum, "Plaintiff had in its possession on March 16, 2106, the documents it later used to file a bid protest, on May 6, 2016; then, almost four months after initial receipt of the

---

[5] This correspondence, including Panter's request and all four of Griffin's emails in response, are attached as exhibits to Griffin's Declaration. (*See* Doc. 42-2 at 4—213.)

10

requested documents, Plaintiff used the same documents to file its complaint in this matter on July 5, 2016." (Doc. 42 at 5.) Defendant argues this demonstrates the untimeliness of Plaintiff's suit. *Id*.

Additionally, in its supplemental memorandum, Defendant elucidates the progress Hitachi and Defendant have made under the contract and asserts it became indebted to Hitachi on April 22, 2016, when it awarded the bid to Hitachi. *Id.* Then, on June 6, 2016, Defendant and Hitachi signed contracts relating to the MRI and CT equipment; on June 22 and June 24, 2016, Defendant signed contracts relating to two x-ray machines, each of which contain provisions that memorialize that Defendant was bound to Hitachi by virtue of the contracts. (Doc. 42 at 6 (citing Doc. 42-3 at 1—2, 7—91).) Defendant claims that starting "in April 2016, and continuing to present day, significant progress has been made on the performance of the contract between Defendant and Hitachi." (Doc. 42 at 7.) Defendant attaches to its brief the Declarations of Jed Roubique, a sales representative for Hitachi, and Thomas Pervanje, a site planning specialist for Hitachi, both of which support Defendant's claim that "significant work was done by Hitachi, including the Hitachi sales representative and the Hitachi site planning specialist, after contract execution to ensure that the Hitachi equipment was properly integrated into the ongoing construction of the new hospital building" and that certain component parts of Hitachi equipment have already been shipped to and installed in the new building, while other pieces are ready for shipment and awaiting logistical support to send from Japan to the new hospital building. (Doc. 42 at 7 (citing Docs. 42-4, 42-5).) Defendant represents that Hitachi's MRI equipment will be delivered as early as December 2016, and no later than January 2017, and notes the equipment requires approximately four weeks lead time to ship from Hitachi's facilities in Japan to the United States. (Doc. 42 at 7.) It argues that if

Hitachi's equipment is not delivered, installed, and operational under the current schedule, it would cause the opening of the new hospital to be delayed. (Doc. 42 (citing Doc. 42-3 at 3—4).)

Finally, Defendant offers an alternative position and asserts that if the Court finds Plaintiff did not have all the necessary information at its disposal, it nonetheless *could have* reasonably ascertained same. Defendant points out that Plaintiff did not avail itself of the enforcement mechanism of La. Rev. Stat. Ann. § 44:35 after it served a public records request upon Defendant. (Doc. 42 at 10—11.) Noting that § 44:35 allows one who has made a public records request, and received a denial from the public body from which it seeks such documents, may apply for a writ of mandamus, injunctive or declaratory relief against the public body, Defendant alleges Plaintiff's failure to take advantage of this enforcement mechanism contributed to its untimely filing. (Doc. 42 at 11.) Defendant maintains that the information was reasonably ascertainable by Plaintiff, if Plaintiff had acted diligently, and its failure to do so weighs in favor of a finding of untimeliness. *Id.*

Based on the foregoing, Defendant insists Plaintiff's claim for injunctive relief was untimely under the facts of this case. Moreover, it notes Plaintiff did not take advantage of the procedural mechanisms at its disposal, including seeking a temporary restraining order, insisting upon a hearing on its motion for injunction within ten days, not availing itself of the enforcement mechanism of La. Rev. Stat. Ann. § 44:35, and by waiving service on Defendant, thereby extending its time to answer. Accordingly, Defendant requests the Court grant judgment in its favor.

### b.  Plaintiff's claims

In its opposition, Plaintiff argues that although Defendant characterizes Plaintiff's claims as untimely, and therefore preempted by La. Rev. Stat. Ann. § 38:2020 *et seq.*, "[n]othing could

be further from the truth." (Doc. 24 at 6.) In support of its assertion, Plaintiff argues that it immediately raised its objection of the award of the contract to Hitachi "through official channels." It represents that it spoke with Defendant in an effort to ascertain why Hitachi had been awarded the contract, and whether that decision was within Defendant's discretion. *Id.* Plaintiff claims it finally received documents from Defense counsel on or about June 23, 2016, and it was only then that it became clear that Defendant violated the Public Bid Law. (Doc. 24 at 7.) Plaintiff filed suit less than two weeks after receiving the documents from Defendant. Accordingly, Plaintiff claims that it's "complaint was timely in every statutory and equitable respect. The Hospital's implication that parties in business disputes should rush to court before basic investigation is contrary to public policy and good business judgment." *Id.* Plaintiff attempts to distinguish the cases cited by Defendant from the instant case, arguing *Airline* does not apply to the instant case because it moved for an injunction "to prevent performance of the contract in 2017 – more than six months before the contract was set to be performed." *Id.* Moreover, Plaintiff insists it sought the injunction before performance of the contract was slated to begin, and it acted timely under relevant statutory and jurisprudential authority. (Doc. 24 at 8.)

Plaintiff also argues Defendant applied an incorrect standard to its motion for a permanent injunction when Defendant alleged Plaintiff must show a likelihood of success on the merits, and Plaintiff insists it need only "plead facts sufficient to show that [its] claim has substantive plausibility[.]" (Doc. 24 at 9 (citing *Johnson v. City of Shelby*, __ U.S. __, 135 S.Ct. 346, 190 L.Ed.2d 309 (2014).) Additionally, Plaintiff alleges it was not required to place the Attorney General on notice before filing suit under La. Rev. Stat. Ann. § 38:2220. (Doc. 24 at 9.) Finally, Plaintiff avers it does not need to make a showing of irreparable harm to be entitled to either a preliminary or permanent injunction. Plaintiff argues that because the conduct it seeks to enjoin is

a violation of a prohibitory law, it need only show that (1) the challenged conduct violates a prohibitory law (ordinance or statute) or the Constitution; (2) that the injunction seeks to restrain conduct, and not order it; and (3) that it has made a *prima facie* showing that it is entitled to the relief sought. (Doc. 24 at 10 (citing *Durr Heavy Constr., LLC v. City of New Orleans*, 15-0915 (La. App. 4 Cir. 3/16/16), 2016 WL 1061384).)

In its supplemental post-hearing brief, Plaintiff takes issue with several of Defendant's characterizations of the progress under the contract. Plaintiff, relying on the deposition testimony of Defendant's CEO Lee Chastant, claims that

> the current "substantial completion" date for the construction of the new hospital facility is actually April 3, 2017, pending any rain delays. This date is later than the January 2017 date obtained from the bid Addendum, or the mid-February 2017 date acknowledged by counsel for [Defendant]. Performance of the publicly bid contract is thus tied to that date."

(Doc. 43-1 at 4. (citing Doc. 43-2 at 5).)[6] With this in mind, Plaintiff attempts to characterize the performance date under the contract as April 3, 2017. (Doc. 43-1 at 5.) Accordingly, it argues its motion for injunctive relief was sought more than nine months in advance of performance, and therefore is timely under *Airline* and its progeny. *Id.*

Plaintiff argues that the construction project at issue in *Airline* is distinguishable from the contract for delivery and installation of equipment at issue in the instant case. (Doc. 43-1 at 6.) Specifically, Plaintiff claims

> [t]he driving focus of those cases is the equitable balance needed where sunk costs on a nullified construction contract would render the bid challenge system potentially devastating to public bodies. That potential inequity would result from the possibility that the public body could have to pay twice for the same work… [Plaintiff's] timely effort to enjoin Hitachi's delivery and installation of equipment in advance of the early 2017 building completion date does not trigger any of these equitable problems. Hitachi can still sell the equipment to another party. Hitachi has not performed any construction work.

---

[6] Plaintiff's pincite is incorrect; Chastant makes these representations at Doc. 42-3 at 6 (or p. 18:9—11 if citing pursuant to the deposition transcript).

*Id.* Additionally, Plaintiff notes the contract between Defendant and Hitachi contains a provision which states that in the event of a cancellation, Defendant would only be obligated to pay the restocking fee, which Plaintiff avers should not be an impediment to nullifying the contract. (Doc. 43-1 at 7.) Moreover, Plaintiff argues that if the Court were to ignore this distinction between this case and the construction contract at issue in *Airline*, and were to take Defendant's "position in regard to publicly bid equipment contracts [, it would] compel every bid party even concerned about the bid outcome to file precautionary TRO's just to be sure they meet the unquantified *Airline* prescriptive period." (Doc. 43-1 at 7.)

Next, Plaintiff claims that the contract between Hitachi and Defendant is absolutely null, and therefore may be "attacked by any party, at any time." *Id.* Plaintiff asserts that *Airline* did not (and could not) displace Louisiana Civil Code article 2032,[7] and therefore it is free to challenge the validity of the contract at any time because any contract made in violation of the Public Bid Law is absolutely null and void. (Doc. 43-1 at 7 (citing *Pittman Constr. Co. v. Parish of East Baton Rouge*, 493 So.2d 178 (La. App. 1 Cir. 1986).) Further, Plaintiff argues that "[w]hen a contract is nullified, the parties are put back in the position they were in before the contract was entered. That would mean Hitachi could not recover per the cancellation terms of the voided contract, but instead would only be entitled to damages it incurred beyond building its own resaleable [sic] inventory." (Doc. 43-1 at 8.)

---

[7] Plaintiff incorrectly asserts that the relevant statute is found within the Louisiana Code of Civil Procedure. (Doc. 43-1 at 7.) However, this is incorrect; the proper codal article Plaintiff seeks is found in the Louisiana Civil Code, article 2032, and it states:

    Action for annulment of an absolutely null contract does not prescribe.
    Action of annulment of a relatively null contract must be brought within five years from the time the ground for nullity either ceased, as in the case of incapacity or duress, or was discovered, as in the case of error or fraud.
    Nullity may be raised at any time as a defense against an action on the contract, even after the action for annulment has prescribed.

Plaintiff alleges that it received documents from Defendant only after it filed its protest letter with the OSP on May 6, 2016 (Doc. 43-1 at 9); however, Plaintiff does not address the series of emails dated March 16, 2016 in which a representative for Defendant in response to a request by Plaintiff's representative, provided myriad documents to that representative. Nevertheless, Plaintiff asserts that it received most of the requested documents on June 23, 2016 (with the exception of the signed contract between Defendant and Hiatchi). (Doc. 43-1 at 11.) It argues that only after this June 23 date did it have sufficient information to file a non-frivolous claim in this Court, and it acted with haste by filing suit on July 5, 2016. *Id.* Moreover, Plaintiff represents that, prior to that time, counsel did not "feel it had sufficiently reliable evidence to safely comply with Rule 11." *Id.* Plaintiff avers that the timeliness under the Public Bid Law must be viewed through the lens of Rule 11; in other words, a plaintiff must have evidentiary support for the allegations contained in the complaint, and this must be the backdrop against which the Court evaluates the timeliness of Plaintiff's complaint. (Doc. 43-1 at 18.)

Plaintiff asserts that Defendant's reference to La. Rev. Stat. Ann. § § 44:35 is a red herring; companies routinely either ignore or deny requests for public records in such a way that would not trigger the protections of § 44:35, and in any event, the statute would not affect the progress under the contract; at best, it may compel Defendants to provide Plaintiff with its requested documents, though Plaintiff vehemently insists Defendants would have found ways to avoid disclosure under the statute. (Doc. 43-1 at 29—32.)

Plaintiff's counsel represents that it purposefully filed its motion for a preliminary injunction after the filing of the initial complaint in order to comply with Local Rule 65, which requires a party to file a motion for a preliminary injunction or TRO in a separate document from the complaint. (Doc. 42-1 at 12; *see also* Local Rule 65.) Plaintiff further claims that its informal

discovery efforts were thwarted by Defendant, and that it acted diligently and judiciously to further the litigation, and insists any delays in litigation were beyond its control. (*See* Doc. 43-1 at 12—15.) In summary, Plaintiff argues that Defendant "has actively, and consistently, worked to prevent [Plaintiff] from obtaining relevant *public* information, and then used that lack of access to attack [Plaintiff's] right to a preliminary injunction, and [Plaintiff's] ability to defend against [Defendant's] motion for summary judgment/motion to dismiss." (Doc. 43-1 at 15 (emphasis original).) Accordingly, Plaintiff has requested a delay in the Court's Ruling on the Motion for Summary Judgment to conduct further discovery, and attached affidavits from Plaintiff's counsel in support thereof. (Docs. 43-1 at 16; 43-2 at 26—28, 34—39.)

### III.   Standard of Review

#### a.   Conversion of 12(b)(6) Motion to Rule 56 Motion for Summary Judgment

Where matters outside the pleadings are considered by the Court on a 12(b)(6) motion to dismiss, Rule 12(d) requires the Court to treat the motion as one for summary judgment, and to dispose of it in accordance with Rule 56. *See* Fed. R. Civ. P. 12(d); *see also Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1283-84 (5th Cir. 1990) (citing *Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972); *Jackson v. Procunier*, 789 F.2d 307, 310 (5th Cir.1986); *see also Curry v. Miss. Dept. of Corr's*, 586 F. App'x 165, 166 (5th Cir. 2014) (Fifth Circuit reviewing the trial court's ruling on a motion to dismiss under the standard for summary judgment because the court considered matters outside the pleadings in rendering its decision). In such instances, the nonmovant is entitled to the procedural safeguards afforded by Rule 56, including the notice requirement. *Id.* (citing *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 195 (5th Cir.1988), *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988); *Capital Films Corp. v. Charles Fries Prods., Inc.*, 628 F.2d 387, 391 n. 1 (5th Cir.1980); *Clark v. Tarrant Cty., Tex.*,

798 F.2d 736, 745 (5th Cir. 1986). The purpose of the notice requirement under Rule 56 "is to prevent surprise to the party against whom the judgment is given." *Clark*, 798 F.2d at 745.

### b.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S. Ct. 1348, 89 L.Ed. 2d 538 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). The party opposing the motion for summary judgment may not sit on his hands, complacently relying on the pleadings. *Weyant v. Acceptance Ins. Co.*, 917 F.2d 209 (5th Cir. 1990). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. General allegations that fail to reveal detailed and precise facts will not prevent the award of summary judgment. *Walton v. Alexander*, 20 F.3d 1350, 1352 (5th Cir. 1994). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

### c.  The Louisiana Public Bid Law

The Louisiana Public Bid Law is codified in La. Rev. Stat. Ann. § 38:2211 *et seq*. It is a prohibitory law founded on public policy. *La. Associated Gen. Contractors, Inc. v. Calcasieu Parish Sch. Bd.*, 586 So.2d 1354, 1359 (La. 1991) (citing *Haughton Elevator Div. v. State Division of Administration,* 367 So.2d 1161 (La.1979)). The Public Bid Law governs the manner by which all contracts for public works are to be awarded. *Durr*, 2016 WL 1061384 at *2 (citation omitted). "It was enacted in the interest of the taxpaying citizens, to protect against favoritism in contracting by public officials resulting in exorbitant and extortionate prices." *Id.* (citing *Dynamic Constructors, L.L.C. v. Plaquemines Par. Gov't,* 2015–0271, p. 4 (La.App. 4 Cir. 8/26/15), 173 So.3d 1239, 1243; *see also Percy J. Matherne Contractor, Inc. v. Grinnell Fire Protection Sys. Co.*, 915 F. Supp. 818, 821 (M.D.La. 1995); *Broadmoor, L.L.C. v. Ernest N. Morial New Orleans Exhibition Hall Auth.*, 04-0211, p. 6 (La. 3/18/04), 867 So.2d 651, 656; *La. Associated Gen. Contractors*, 586 So.2d at 1362 ("the purpose of the Public Bid Law is to secure free and unrestricted competition among bidders, to eliminate fraud and favoritism, and to avoid undue or excessive costs."). Accordingly, "it is 'a prohibitory law founded on public policy,' and must be strictly construed." *Id.* "A political entity has no authority to take any action which is inconsistent to the public bid law." *Broadmoor*, 867 So.2d at 656 (citing *La. Associated Gen. Contractors*, 586 So.2d at 1362).

La. Rev. Stat. Ann. § 38:2212 provides:

> A. (1) All public work exceeding the contract limit as defined in this Section, including labor and materials, to be done by a public entity shall be advertised and let by contract to the lowest responsible and responsive bidder who had bid according to the bidding documents as advertised, and no such public work shall be done except as provided in this Part.
> (2) The term "bidding documents" is defined in R.S. 38:2211(A).

> *B. (1) The provisions and requirements of this Section and those stated in the bidding documents shall not be waived by any entity.*

La. Rev. Stat. Ann. § 38:2212 (emphasis added).

"Bidding documents' means the bid notice, plans and specifications, bid form, bidding instructions, addenda, special provisions, and all other written instruments prepared by or on behalf of a public entity for use by prospective bidders on a public contract." La. Rev. Stat. Ann. § 38:2211(A)(2). Thus, under the plain language of the statute, the substantive bidding requirements, as set by the entity inviting the bids, are not waivable by the entity after they have been set, nor may the entity deviate from its own specifications after the bidding has been closed. *See Durr*, 2016 WL 1061384 at *2; *Broadmoor*, 867 So.2d at 657 ("when a public entity elects to place certain requirements in its advertisements for bids and on its bid forms, that entity is bound by those requirements and may not choose to waive them at a later date."). As a general matter, Louisiana courts strictly construe the Public Bid Law, and this is particularly true with respect to the non-deviation mandate of the statute. *See Wallace C. Drennan v. Sewerage & Water Bd.*, 00-1146 (La. App. 4 Cir. 10/3/11), 798 So.2d 1167, 1173 ("[W]e construe La. R.S. 38:2212(A)(1)(b) to preclude an entity from waiving substantive provisions and requirements of the Public Bid Law, the advertisement for bids and bid forms… [I]t may not treat substantive requirements of the Bid Law, the Advertisement for Bids and Bid Forms as mere informalities in order to justify its decision to waive the deviation in a bid.") (citations omitted); *see also Barriere Constr. Co., L.L.C. v. Terrebonne Parish Consol. Gov.*, 99–2271 (La.App. 1 Cir. 2/18/00), 754 So.2d 1123, 1127 *writ denied,* 00–0801 (La.5/5/00), 761 So.2d 546 ("The statutory requirements, advertisement requirements, and bid form requirements, including those included by reference to other documents, must be completely and accurately observed. The Public Bid Law could not be more

clear in stating that a bidder's failure to comply with every detail can invalidate the bid. The consequences of such defects should be on the bidder who prepares the bid.").

Under the Public Bid Law, all public construction contracts of "major importance" must be let to the "lowest responsible bidder." *Broadmoor*, 867 So.2d at 656 (citing *La. Associated Gen. Contractors*, 586 So.2d at 1362). As explained in *Broadmoor*,

> The term "lowest responsible bidder" does not constrain the public authority to accept the lowest monetary bid. Rather, the Public Bid Law vests the public entity contracting the work with wide discretion to determine bidder responsibility. In determining bidder responsibility, the public entity may look to financial ability, skill, integrity, business judgment, experience, reputation, quality of previous work on contracts, and other similar factors bearing on the bidder's ability to successfully perform the contract.

867 So.2d at 656.

## IV.   Discussion

In their briefs, the parties raise myriad procedural and substantive issues. However, the Court pretermits consideration of most of these issues, as it finds the issue of timeliness controls the disposition of this case. Because Plaintiff did not "seek injunctive relief at the time when the grounds for attacking the wrongful award of the contract were known or knowable to [it]", Defendant is entitled to summary judgment. *See Airline Constr. Co., Inc. v. Ascension Parish Sch. Bd.*, 568 So.2d 1029 (La. 1990).

### a.   Timeliness under the Public Bid Law

While it is well-settled under Louisiana jurisprudence that a court may not typically "enjoin a municipal body from acting under the guise of its legislative powers", a court has authority to do so "where the threatened action of a municipal body is 'in direct violation of a prohibitory law[,]'" such as the Louisiana Public Bid Law. *La. Associated Gen. Contractors*, 586 So.2d at 1359 (quoting *Bardwell v. Parish Council of Parish of East Baton Rouge,* 44 So.2d 107 (1949); *Durrett*

*Hardware & Furniture Co. v. City of Monroe,* 5 So.2d 911 (1942)). Indeed, this right to seek injunctive relief was made a part of the Public Bid Law itself in 1979. *See Airline*, 568 So.2d at 1032—33 (citing La. Rev. Stat. Ann. § 38:2220 (1979)).

However, the statute provides no prescriptive period within which such injunctive relief must be sought, a fact bemoaned by Justice Lemmon in his concurring opinion in *Bristol Steel and Iron Works, Inc. v. State of Louisiana, Department of Transportation and Development*, 507 So.2d 1233 (La. 1987). "There is an apparent need for legislative action providing a limitation on the time for filing injunctions (as, for example, by requiring any injunction to be filed during a period of fifteen or thirty days between the awarding of the bid and the execution of the contract) and an expedited procedure for disposition of appeals by preference over other cases." *Id*. at 1237 n.2 (Lemmon, J. concurring).

While the Legislature has never acted on Justice Lemmon's invitation, the jurisprudence has made clear that a plaintiff who wishes to enjoin the municipal body for a violation of the Public Bid Law must act quickly. As the seminal case under Louisiana law explains:

> an unsuccessful bidder on a public contract who fails to resort to the relief granted by statute by attempting to enjoin timely the execution or the performance of the contract, when the facts necessary for injunctive relief are known or readily ascertainable by the bidder, is precluded from recovering damages against the public body.

*Airline*, 568 So.2d at 1033.[8] The need for quick action is apparent from the dynamics inherent in the process. Once the bid is awarded, the public body will enter into a contract with the successful bidder, work will commence, goods and services will be provided, and both time and money will be expended. As the Louisiana Fifth Circuit Court of Appeal explained, "[t]he interests to be

---

[8] Following *Airline*, La. Rev. Stat. Ann. § 38:2220(B) was amended, but the timeliness rule of law established by Airline is still applicable. *Executone Sys. Co. of La., Inc. v. Jefferson Parish Hosp. Serv. Dist. No. 2*, 15-569, p. 9 (La. App. 5 Cir. 2/24/16), 186 So.3d 1210, 1216, *writ denied*, 191 So.3d 1059 (La. 5/3/16); *Webb Constr. v. City of Shreveport*, 27,761 (La. App. 2 Cir. 12/06/95), 665 So.2d 653,656.

balanced in cases involving Louisiana's public bid law are the interest of a particular bidder in receiving the contract versus the public interest in having the contract awarded expeditiously to the bidder who can most economically perform the work in a responsible manner." *Haughton Elevator*, 367 So.2d at 1166.

Because the statute provides no prescriptive period, the issue of timeliness is necessarily a fact-specific inquiry focusing generally on two basic but interrelated factors: first, the diligence of the party challenging the bid and second, the degree to which the contract sought to be set aside has been fulfilled at the time it is challenged and the practical consequences of nullifying it. In the words of the Court in *Airline*, an unsuccessful bidder "must seek injunctive relief at a time when the grounds for attacking the wrongful award of the contract were known or knowable to the bidder and when corrective action as a practical matter can be taken by the public body." 568 So.2d at 1035 (citation omitted). Moreover, "[i]f an aggrieved bidder does not timely file a suit for injunction, he has *waived any right he may have to claim damages* against the public body or the successful bidder." *Id.* (emphasis added). According to *Airline*, in determining the timeliness of plaintiff's claim for injunctive relief, the Court should evaluate:

> The knowledge possessed by the attacking bidder concerning the wrongful award of the contract, the point in time the bidder acquired this knowledge, the point in time that the public body became indebted to the successful bidder, and the time period between the awarding of the illegal contract and the completion of construction.

*Id.*; *see also Grinnell*, 915 F. Supp. at 823. Nonetheless, if a plaintiff failed to timely file for injunctive relief, it may not be precluded from relief if it can demonstrate that "circumstances existed which made the filing of a timely suit for injunction *impossible*." *Airline*, 568 So.2d at 1035 (emphasis added). If it cannot show impossibility or the timely filing of suit, the plaintiff will be denied relief. *See id.*

23

A review of the jurisprudence on this issue demonstrates how these principles have been applied and suggests that, under appropriate circumstances, even a short delay in requesting injunctive relief will render the plaintiff's claims untimely. In *Hartman Enterprises, Inc. v. Ascension-St. James Airport and Transportation Authority*, 582 So.2d 198 (La. App. 1 Cir. 1991), the court found that the plaintiff's delay of six weeks in seeking injunctive relief was unreasonable under the following facts: on August 24, 1990, a contract was awarded to a third party under the Public Bid Law. *Hartman*, 582 So.2d at 200. On August 30, 1990, the public entity and third party signed the written agreement, and on September 4, the winning bidder began work on the project. *Id.* On September 23, 1990, the plaintiff conducted an aerial inspection of the work site to observe the work in progress; he later testified only a small percentage of the work had been completed on that date. *Id.* However, the plaintiff waited until October 9, 1990 to file a petition for a preliminary injunction to halt work on the job. *Id.* Despite the plaintiff's notice that this was a *short-term contract*, he did not seek a temporary restraining order to halt progress. *Id.* By the time a hearing was held on November 7, 1990, work on the project was over 90 percent complete. *Id.* Based on the foregoing, the court concluded:

> Following the test in [*Airline*], the whole record shows that [the plaintiff] had "readily ascertainable" to him sufficient facts to bring a timely request for injunctive relief and the record further reveals that under the facts of this case he did not bring an action for injunctive relief timely, and therefore under *Airline* he is precluded from recovering damages against the public body.
>
> We recognize that at the time the suit was instituted on October 9, 1990, the job was not substantially complete; however, plaintiff sought no Temporary Restraining Order, nor did he apparently insist upon a hearing on the injunction within ten days. Having failed to insist upon the rights available to him, they must be considered to have been waived.

*Hartman*, 582 So.2d at 201; *cf. Stafford Constr. Co., Inc. v. Terrebonne Parish Sch. Bd.*, 612 So.2d 847 (La. App. 1 Cir. 1992) (finding the plaintiff's suit for injunctive relief was timely where

the plaintiff filed suit within ten days of learning of the alleged violation of the Public Bid Law and before performance under the contract commenced).

However, in *G.D. Womack Trenching, Inc. v. Maitland Water Systems, Inc.*, 03-1579, (La. App. 3 Cir. 4/7/04), 870 So.2d 579, the court found that the unsuccessful bidder's lawsuit, filed approximately six months after the bidder became aware the contract was unlawfully awarded to a third party, was timely. In *Womack*, the bidders, including the plaintiff Womack, were given notice the contract was awarded to a third party on November 18, 2002. 870 So.2d at 581. On January 9, 2003, the owner and the successful bidder met to discuss the contract. *Id.* On January 14, a stop work order was issued because of delays in clearing and grubbing the project site; however, the successful bidder was instructed that it should continue to order materials for the project. *Id.* On April 11, 2003, the successful bidder sent an invoice for pipe it had purchased for the project. On May 5, 2003, Womack filed a petition against the owner and the successful bidder seeking to enjoin performance of the contract and a declaratory judgment that the contract was illegal and void on the grounds that the owner "engaged in post-bid manipulation that made [the successful bidder's] bid the lowest bid." *Id.* Womack also sought a declaratory judgment naming it the lowest bidder and awarding it the contract. *Id.* On that same date, the trial court issued a Temporary Restraining Order.

In a written ruling on August 23, 2003, the trial court found Womack's suit was not untimely because Womack had sued for injunctive and declaratory relief prior to any work being performed on the project. *Id.* at 582-83. Despite the fact Womack waited six months after receiving knowledge of the operative facts that gave rise to its claim, and offered no reason for its delay, the court nonetheless found the suit timely because the stop order had been issued and work had not yet begun on the project. *Id.* at 583. Although the successful bidder alleged it had already incurred

expenses by purchasing materials for the job and made other arrangements to begin work on the project, "[t]he trial court found that payment for the materials could be arranged so that [the successful bidder] would be returned to its original position." *Id.* Furthermore in considering the *Airline* factor of whether "corrective action as a practical matter can be taken by the public body" and because the stop work order had been issued, the court found Womack satisfied this element, and therefore its suit was timely. *Id.* The Third Circuit affirmed. *Id.*

Similarly, in *Ryan Gootee General Contractors LLC v. Plaquemines Parish School Board*, 15-0678 (La. App. 4 Cir. 11/18/15), 2015 WL 7356420, the Louisiana Fourth Circuit Court of Appeal found the plaintiff's suit for injunctive relief timely where the plaintiff placed the public entity on notice of the deficiencies in the successful bidder's bid prior to the letting of the contract. *See Ryan Gootee*, 15-0678 at *4. Additionally, the plaintiff sued the public entity approximately one week after the unlawful award of the contract. *Id.* The plaintiff moved for a temporary restraining order, and subsequently moved for permanent injunctive relief *before the successful bidder began work under the contract*. *Id.* Based on the foregoing, the Fourth Circuit concluded the plaintiff timely filed suit to enjoin enforcement of the contract. *Id.*

There are few federal cases involving the Louisiana Public Bid Law, and even fewer which turn on the issue of timeliness.[9] For example, in *Siemens Building Technologies, Inc. v. Jefferson Parish*, 03-2272, 2004 WL 1837386 (E.D.La. Aug. 16, 2004), the plaintiff sought to enjoin a public construction contract arising out of the Louisiana Public Works Act, La. Rev. Stat. Ann. § 38:2241 *et seq*. The court applied the *Airline* test and found that the plaintiff's suit, brought several months after the conduct which violated the Public Bid Law occurred, was timely filed. *Id.* at *8—*9.

---

[9] *See e.g.*, *Marco Outdoor Advertising, Inc. v. Reg'l Transit Auth.*, 489 F.3d 669 (5th Cir. 2007) (discussing violation of Louisiana Public Bid Law in the context of a § 1983 claim; no discussion of timeliness); *Sys. Contractors Corp. v. Orleans Parish Sch. Bd.*, 148 F.3d 571 (5th Cir. 1998) (same); *Cantu Servs., Inc. v. Frazier*, 2014 WL 2736072 (W.D.La. June 13, 2014) (same)

Central to the court's decision was the defendant's conduct in refusing to provide plaintiff with information necessary to evaluate why the bid had been awarded to a third party. Plaintiff first sent a letter to the defendant's architect after the defendant rejected the plaintiff's bid asking the defendant to produce justification for rejecting its bid six days after the plaintiff was notified its bid was rejected. *Id.* at *9. The defendant never responded to the plaintiff's request. *Id.* Approximately two weeks later, the plaintiff sought the same information from the defendant through a public records request, and once again the defendant failed to provide the requested documentation. *Id.* Thereafter, the plaintiff again attempted to obtain the documentation, this time through a discovery request and the defendant once again refused to respond to the plaintiff's request. It was not until the court granted the plaintiff's motion to compel the production of the requested documents that the plaintiff obtained the operative documents that revealed the facts that gave rise to its suit. *Id.* In short, the defendant's refusal to provide the necessary documents to plaintiff despite the plaintiff's repeated requests for same rendered it impossible for the plaintiff to timely file suit, and therefore, the court found its suit timely. *Id.*

This Court addressed the issue of timeliness under the Public Bid Law in *Percy J. Matherne Contractor, Inc. v. Grinnell Fire Protection Systems Co.*, 915 F. Supp. 818 (M.D.La. 1995). In *Grinnell*, the contractor brought suit against its subcontractor to recover the difference between the subcontract price and the price charged by a third party subcontractor after the original subcontractor refused to perform under the contract. The contractor also sought to declare its contract with the public entity null and void for failure to comply with statutory bidding requirements because it made modifications to the IFB after the bidding had opened. *Grinnell*, 915

F. Supp. at 821. Declining to reach the merits of the plaintiff's claims,[10] the Court held the plaintiff waived its rights under the Public Bid Law because it failed to timely file for injunctive relief. *Id.* at 823. The post bid-changes were "reasonably ascertainable" to the plaintiff by March 24, 1993. *Id.* However, the plaintiff waited to seek injunctive relief until July 1994, when the project was already underway; the Court noted that by January 1995, the project was 78% complete. *Id.* at 824. Under these facts, the Court concluded, "Grinnell's assertion of invalidity after some fifteen months, when the Project was substantially underway is an unreasonable delay. Therefore, Grinnell has waived any right it may have had to assert the invalidity of the contract…" *Id.*

### b. Application

The Court begins its analysis by taking judicial notice of several factors not raised by either party, but that the Court believes provide relevant background information in this case.[11] According to the United States Census Bureau, West Feliciana Parish has a population of approximately 15,385 individuals.[12] Defendant is the sole hospital that services the entire parish, and the facilities it presently utilizes are considered "outdated."[13] The equipment at issue here is but one component of the new facility, which is set to include, *inter alia*, 12 inpatient beds, a fully

---

[10] Due to a lengthy procedural history and detailed fact pattern, wholly irrelevant to this Ruling, the party filing for injunctive relief was actually the defendant in *Grinnell*, but for present purposes and for simplicity's sake, this Ruling refers to the party seeking injunctive relief as the plaintiff.

[11] Pursuant to Federal Rule of Evidence 201(b), this Court may take judicial notice of "publically-available documents and transcripts" produced by a state or federal agency "which were matters of public record directly relevant to the issue at hand." *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F.Supp.3d 604 (M.D.La. 2015) (quoting *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir.2011); *see also, e.g.*, *Norris v. Hearst Trust*, 500 F.3d 454, 461 n. 9 (5th Cir.2007)). Additionally, the Court may take judicial notice of stories in newspapers and on Internet news sites. *See Ieradi v. Mylan Laboratories, Inc.*, 230 F.3d 594, 598 n.2 (3d Cir. 2000); *U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 592 n.34 (E.D. Va. 2011); *Shell Oil Co. v. Kleppe*, 426 F. Supp. 894, 903 n.3 (D. Colo. 1977), judgment aff'd, 591 F.2d 597 (10th Cir. 1979), judgment aff'd, 446 U.S. 657, 100 S. Ct. 1932, 64 L. Ed. 2d 593 (1980).

[12] UNITED STATES CENSUS BUREAU, http://www.census.gov/quickfacts/table/PST045215/22125 (last visited Nov. 16, 2016). This population estimation is from 2015, and it is the most recent statistic published by the U.S. Census Bureau. *See id.*

[13] Howard Arceneaux, *New hospital coming: No plans yet on use for old West Feliciana building*, THE ADVOCATE (May 6, 201, 4:47 AM), http://www.theadvocate.com/baton_rouge/news/communities/west_feliciana/article_81e762e1-3aa0-5b20-be3b-30b7d6ca3ca5.html.

equipped emergency room, a laboratory, an education room, an area for outpatient services, and an area for imaging, which will be the location of the CT scanner, MRI machine, and X-ray machine.[14] According to Defendant's CEO, the new facility is intended "to match what's happened with health care in the last 40 years… It's a much smarter operation, and patients will be able to get in and out much quicker. The theme is wellness, not just an institutional facility."[15] It is designed with the objective of "expand[ing] the hospital's current offerings of quality patient services that are closer to home for comfort and convenience."[16] According to Defendant's website, the total cost for the new facility is approximately $27.7 million, $5.7 million of which is designated for equipment and furnishings.[17] Defendant's contract with Hitachi is in the amount of $2,165,900 (Doc. 6-1 at 4.); in other words, the contract with Hitachi consumes less than 8% of the total budget allocated to the construction of the new facility, and is but one aspect of this comprehensive, multi-dimensional healthcare facility.

As noted above, because the statute provides no prescriptive period, the issue of timeliness is necessarily a fact-specific inquiry focusing generally on two basic but interrelated factors: first, the diligence of the party challenging the bid and second, the degree to which the contract sought to be set aside has been fulfilled at the time it is challenged and the practical consequences of nullifying it. With this in mind, the Court turns to application of the specific *Airline* factors to the facts of this case. *Airline* instructs the Court to look at:

> among other things, the knowledge possessed by the attacking bidder concerning the wrongful award of the contract, the point in time the bidder acquired this knowledge, the point in time that the public body became indebted to the successful

---

[14] *Id.*

[15] *Id.*

[16] *Construction starts on $27 million West Feliciana Parish Hospital*, The Advocate (Feb. 6, 2016, 11:04 AM), http://www.theadvocate.com/baton_rouge/news/business/article_a9b712df-55b0-59e9-b84e-0821779205c0.html.

[17] *Statistical Information Slide Show*, WEST FELICIANA PARISH HOSPITAL, http://wfph.org/PageDisplay.asp?p1=6892 (last visited Nov. 16, 2016.)

bidder, and the time period between the awarding of the illegal contract and the completion of construction.

568 So.2d at 1035.

Plaintiff's counsel avers that he discussed the "errors in the award" with defense counsel for the first time on May 4, 2016. (Doc. 43-1 at 9.) Moreover, counsel claims it was not until June 23, 2016 that defense counsel provided him with any documentation, and the documents he received did not include the contract between Defendant and Hiatchi. (Doc. 43-1 at 11.) However, these allegations are undermined by the fact that Plaintiff's detailed and comprehensive protest letter to the OSP, sent on May 6, 2016, parallels Plaintiff's Complaint in this Court in several important respects. (*Compare* Docs. 42-1 at 1—8; 1 at 5—17.) The seven and a half-page letter Plaintiff's counsel sent to GE detailed the alleged deficiencies in Hitachi's bid, and asserted that "Hitachi deviated from the specifications in multiple respects… [and therefore] its bid must be rejected as nonresponsive." (Doc. 42-1 at 2.) After carefully outlining all of the alleged nonresponsive aspects of Hitachi's bid (which are also reflected in Plaintiff's Complaint), Plaintiff's counsel concluded, "Hitachi's bid is non-responsive as a matter of law. Hitachi was improperly awarded the contract… that error cannot stand. Hitachi's bid must be rejected as non-responsive, and [Plaintiff], as the lowest responsive and responsible bidder, must be awarded with the contract." (Doc. 42-1 at 7—8.) Plaintiff's counsel then attached 164 pages of documents relating to Hitachi's bid and the alleged deficiencies therein, to its protest letter. (Doc. 42-1 at 9—172.) These attachments included a spreadsheet which detailed every aspect of the IFB and Hitachi's response and offered a "GE Healthcare Note" in which Plaintiff offered its opinion on whether each specification in Hitachi's bid was responsive to the IFB. Thus, based on counsel's protest letter, it is patently obvious that Plaintiff, in fact, had sufficient information at its disposal to bring a non-frivolous suit for injunctive relief as early as May 6, 2016. (Doc. 42-1 at 9—15.)

Additionally, Defendant has submitted evidence showing that a representative for Plaintiff had information critical to the alleged wrongdoing as early as March 16, 2016. In support of its supplemental brief, Defendant attaches the Declaration of Lori Griffin, purchasing agent for Defendant, which demonstrates that she provided Plaintiff's representative several files of information relating to Hiatchi's bid immediately upon his request for same. (*See* Doc. 42-2.) Specifically, Griffin stated that on March 16, 2016, at 12:26 p.m., she received an email from Justin Panter, Account Manager for VasoHealthcare Sales Professionals, an authorized manufacturer representative for Plaintiff, requesting Hitachi's bid proposal. (Doc. 42-2 at 1—2.) Griffin replied to Panter approximately two hours later and advised him she would send him all of the data submitted by Hitachi in six emails, as the files were too voluminous to send in one email. (Doc. 42-2 at 2.) As evidenced by the exhibits attached to Griffin's Declaration, Griffin proceeded to send Panter all six emails between the times of 2:29 p.m. and 2:36 p.m. on March 16, 2016. (*See* Doc. 42-2 at 3—212.) At 2:56 p.m., Panter responded via email, acknowledging receipt and thanking Griffin for producing the requested documentation. (Doc. 42-2 at 3, 212.) Thus, it is plainly obvious that at least one representative for Plaintiff had acquired documents that imparted "knowledge… concerning the wrongful award of the contract" by March 16, 2016. *See Airline*, 568 So.2d at 1035. The fact that there was an apparent lack of communication between Plaintiff's counsel and other non-legal representatives for Plaintiff does not excuse the fact that Plaintiff's counsel could have ascertained this information at an earlier date, but failed to do so.

Based on the foregoing, it is abundantly clear that "grounds for attacking the wrongful award of the contract were known or knowable" to Plaintiff as early as March 16, 2016. *Id.* at 1035. Plaintiff waited until July 5, 2016 to file suit and until July 22, 2016 to request a preliminary injunction. Although Plaintiff contends it was simply following Local Rule 65 by not including its

Motion for Preliminary Injunction in the same filing as its Complaint, it provides no explanation for why it waited two and a half weeks from the time it filed its Complaint to file for a preliminary injunction. (*See* Doc. 42-1 at 12; *see also* Local Rule 65.) Thus, Plaintiff waited three and a half months from the time "the facts necessary for injunctive relief [were] known or readily ascertainable" by Plaintiff before filing suit, and waited more than four months to seek a preliminary injunction. *Id.* at 1033. Plaintiff waived formal service thus allowing Defendant additional time to answer, did not request a TRO and did not request an expedited hearing on its motion for preliminary injunction. Moreover, Plaintiff has made no showing "that circumstances existed which made the filing of a timely suit for injunction impossible." *Id.* at 1035. Therefore, under *Airline*, this factor weighs in favor of a finding of untimeliness.

The next factors for the Court to consider under *Airline* asks at what point in time the public body became indebted to the successful bidder and the time period between the award of the allegedly illegal contract and the completion of the project. *Id.* at 1035. Defendant avers that it became indebted to Hitachi on April 22, 2016 when it awarded the bid to Hitachi. (Doc. 42 at 6.) In support of this assertion, it attaches a Declaration from its CEO, Lee Chastant. (*See* Doc. 42-3.) Attached to Chastant's Declaration are the signed contracts between Defendant and Hitachi, which reflect that the parties executed contracts on June 6, 2016 relating to the MRI and CT equipment, as well as two additional contracts executed on June 22, 2016 and June 24, 2016, both of which concerned the purchase and installation of two x-ray machines. (Docs. 42 at 6; 42-3.) The contracts reflect payment terms as follows:

   a. $100,000 is due with the signed order
   b. Balance equaling a total of 25% is due 90 days prior to shipment
   c. An additional 65% is due upon delivery and before installation
   d. 10% is due upon completion of installation and before first clinical use
      …
      7. **Changes and Cancellations**

32

Orders accepted by [Hitachi] are not subject to changes or cancellation by the Purchaser except with [Hitachi's] written consent. If Purchaser cancels this Agreement within ninety (90) days prior to delivery of the Products, Purchaser shall pay [Hitachi] a cancellation charge of fifteen percent (15%) of the Total System Price. [Hitachi] shall retain as credit all progress payments made to that point towards this cancellation charge. If Purchaser cancels this Agreement prior to this ninety (90) day period described above, all progress payments which have been made to that date, but not to exceed fifteen percent (15%) of the Total System Price, will be held as cancellation charge.

(Doc. 42-3 at 18, 22, 54, 56.)

Additionally, Defendant attaches Declarations from two representatives from Hitachi which provide a detailed timeline of all efforts made by Defendant and Hitachi in furtherance of the contracts. (See Docs. 42-4; 42-5.) For example, in the Declaration of Jed Roubique, sales representative for Hitachi, it is asserted that Hitachi received notice it had been awarded the contract on April 22, 2016; on April 25, 2016, Roubique began working with the consulting group, architect, and engineers to start the process of adjusting the Computer-aided Design construction drawings of the hospital's imaging department, specifically to meet the parameters of Hitachi's equipment. On that same date, Roubique sent the drawings of the facility to Hitachi's site planning department for the x-ray equipment; on April 26, he sent site planning details for the Hitachi equipment to Defendant's consulting group, architect, and engineers; and on April 28, 2016, he met with Defendant's general contractor and the planning committee to discuss construction of the new facility. (Doc. 42-4 at 1.) Roubique's Declaration provides specific detail of discrete endeavors undertaken by Hitachi and Defendant in furtherance of the contract, and concludes by noting that as of October 27, 2016, certain parts of the equipment had already been delivered and installed at the new facility. (*See* Doc. 42-4.)

Similarly, the Declaration of Thomas Pervanje, site planning specialist for Hitachi, also provides a comprehensive timeline of all efforts undertaken by both Defendant and Hitachi in

furtherance of the contracts. (Doc. 42-5.) Pervanje avers that on April 23, 2016, after learning Hitachi was awarded the bid, he began preliminary site layout designs for the MRI and CT installations; on April 28, he completed Hitachi's site layout plans and submitted them for review; on May 1, he was informed by a Hitachi sales representative that the MRI/CT delivery date would be January 2017; and on May 5, 2016, he began working with Defendant's mechanical engineer to identify and clarify certain specifications for the MRI equipment. (Doc. 42-5 at 1—2.) Like Roubique's Declaration, Pervanje's Declaration provides specific dates upon which plans were carried out in furtherance of performance under the contract. (Doc. 42-5.) Both of these Declarations, when read in tandem, lead to the conclusion that progress under the contract was already underway, and significant efforts had already been undertaken by both Hitachi and Defendant, by the time Plaintiff filed suit on July 5, 2016. Thus, based on the foregoing, it is clear that these factors under *Airline* lead to the conclusion that Plaintiff's Complaint and request for injunctive relief were not filed timely. *See Airline*, 568 So.2d at 1035.

Plaintiff contends, on the other hand, that the relevant date the Court must consider in evaluating the timeliness of its claim is April 3, 2017, because this is the date Defendant's CEO projected as the "substantial completion" date of the new facility. (Doc. 43-1 at 4.) However, Plaintiff offers no jurisprudential support for this assertion. Moreover, as a practical matter, this assertion fails to take into consideration that the new facility encompasses far more than just the imaging equipment at issue here; as discussed above, the facility includes inpatient care, an emergency room, an education facility, a laboratory, and outpatient services. Thus, Plaintiff's characterization that the installation of imaging equipment will not be substantially completed until April 3, 2017 because that is the projected date of substantial completion for the facility *as a whole* is logically flawed and factually erroneous. Defendant has represented that performance under the

contract (i.e. delivery and installation of Hitachi's imaging equipment) is due in January 2017, and in fact, is presently underway and completion is anticipated ahead of schedule, and has supported this assertion with declarations by Defendant's CEO as well as two representatives from Hitachi. (Docs. 12 at 3; 42 at 7; 42-3 at 2; 42-4 at 2; 42-5 at 2.) Plaintiff has not refuted this assertion.[18]

At any rate, regardless of whether performance under the contract is due in January or April 2017, Plaintiff's claim for injunctive relief is nevertheless untimely under the facts of this case. The *Airline* standard asks "when the facts necessary for injunctive relief are known or readily ascertainable by the bidder" to determine the timeliness of a claim for injunctive relief. *Airline*, 568 So.2d at 1033. It does not inquire about the projected date of substantial completion on an overarching project, especially where, as is here, the contract at issue is but one discrete part of a much larger endeavor. As noted above, Defendant has provided evidence that performance under the contract will be completed no later than January 2017, and this is the date upon which the Court believes the *Airline* factors must be evaluated.

In summary, the facts giving rise to the Complaint were knowable to Plaintiff as early as March 16, 2016, and were undoubtedly known by Plaintiff's counsel no later than May 6, 2016. Plaintiff did not file suit until July 5, 2016, some three and a half months after the operative facts were knowable to Plaintiff. Plaintiff has made no showing that it was impossible to bring suit earlier. After filing suit in this Court, Plaintiff waived service on Defendant, thereby allowing it 60 days to respond (*see* Fed. R. Civ. P. 4(d)(3)). It did not file for a TRO, nor did it insist upon an

---

[18] The cited deposition testimony relied on by Plaintiff in connection with its assertion reads as follows:
> A: … In fact, I do know the current date they expect to complete.
> Q: What is the most current information that you have?
> A: April 3rd [2017].
> Q: And April 3rd completion, what does that mean in terms of the hospital's ability to function?
> A: What I understand, it is substantial completion. So that is they day we can begin to do all of our training and prepare for our, you know, we have to be reviewed by a joint comission [sic] and DHH. We can begin to set up for those inspections.

(Doc. 43-2 at 6.) This does not negate Defendant's representations regarding performance under the contract.

expedited hearing after the filing for preliminary injunctive relief on July 22, 2016. *See Hartman*, 582 So.2d at 201 (if a plaintiff fails to insist upon the rights available to it, such rights "must be considered to have been waived.").  In the interim, Defendant and Hitachi executed the contracts at issue on June 6, 22, and 24, 2016, and immediately thereafter, their architects, site planning specialists, engineers, and sales representatives began working on the logistics of tailoring the new facility to Hitachi's specifications. Defendant became indebted to Hitachi upon the signing of these documents, and has currently made several installment payments on the contract. By October 2016, certain component parts of the equipment had already been delivered and installed at the new facility. As of the date of this Ruling, several other components are en route to the new facility from Hitachi's warehouse in Japan. The facility is a new, state-of-the-art hospital, and it is the sole hospital serving the residents of West Feliciana Parish. It is an ambitious undertaking to the tune of $27,700,000 of taxpayer dollars.

In light of the foregoing, the Court is unwilling to issue an order which would cause the opening of the facility to be delayed, to increase the cost already spent on the project, and which would require the removal of equipment that has already been installed in the facility. The Court realizes that de facto limitation period of two to three months is but a blink of the eye in the typical world in which an attorney practices. But the Court is also cognizant of the unique and pressing requirements under the Public Bid Law. As the jurisprudence makes abundantly clear, the Louisiana Public Bid Law is a unique creature with extraordinarily stringent requirements. *See*, *e.g.*, *Grinnell*, 915 F. Supp. at 823; *Airline*, 568 So.2d at 1035; *Hartman*, 582 So.2d 198. This Court declines to deviate from the well-established jurisprudence requiring an aggrieved bidder to act timely, and it holds that under the facts and circumstances of this case, Plaintiff's claim for

injunctive relief was untimely filed. Accordingly, Plaintiff "has waived any right [it] may have to claim damages against the public body or the successful bidder." *Airline*, 568 So.2d at 1035.

Plaintiff asserts that even if this Court finds its claim for injunctive relief untimely, it must nonetheless find the contract between Defendant and Hitachi absolutely null, and thus unenforceable, under Louisiana Civil Code articles 7 and 2032. (Doc. 43-1 at 23—24 (citing *Enmon Enters., LLC v. City of New Orleans*, 15-0763 (La. App. 4 Cir. 5/4/16), 194 So.3d 709, 712; *State Mach. & Equip. Sales, Inc. v. Iberville Parish Council*, 05-2240 (La. App. 1 Cir. 12/28/06), 952 So.2d 77, 83—84).) La. Civ. Code art. 7 reads: "Persons may not by their juridical acts derogate from laws enacted for the protection of the public interest. Any act in derogation of such laws is an absolute nullity." Article 2032 reads, in relevant part, "Action for annulment of an absolutely null contract does not prescribe… Nullity may be raised at any time as a defense against an action on the contract, even after the action for annulment has prescribed." Relying on these mandates, Plaintiff argues that:

> If an aggrieved bidder on a public contract has *timely* filed suit for injunctive relief, but injunctive relief is no longer available, the bidder may recover damages against the public entity. The question of whether the contract was properly awarded is not rendered moot by the fact that injunctive relief is no longer available.

(Doc. 43-1 at 23 (quoting *State Mach.*, 952 So.2d at 83—84) (emphasis added).) However, *State Machinery* does not lend support to Plaintiff's position, because, by its plain language, it applies only in circumstances in which the Court finds the bidder has *timely* filed suit for injunctive relief, but such relief is no longer available as a practical matter. As discussed above, Plaintiff's claim for injunctive relief was not timely filed, and thus *State Machinery* is inapposite.

Nonetheless, Plaintiff suggests that *Airline* is irreconcilable with the clear mandate of Articles 7 and 2032 of the Louisiana Civil Code. (See Doc. 43-1 at 7.) While Plaintiff is certainly correct that a contract made in violation of the Public Bid Law is absolutely null and void, *see*

*Pittman Constr. Co. v. Parish of East Baton Rouge*, 493 So.2d 178 (La. App. 1 Cir. 1986), this does not mean that *Plaintiff*, a nonparty to the allegedly null contract, may seek to annul the contract between Defendant and Hitachi at any time. Earlier this year, the Louisiana Fifth Circuit Court of Appeal was faced with this exact situation in *Executone Systems Co. of Louisiana, Inc. v. Jefferson Parish Hospital Service District No. 2*, 15-569 (La. App. 5 Cir. 2/24/16), 186 So.3d 1210. Like Plaintiff here, the aggrieved bidder plaintiff in *Executone*, a non-party to the disputed contract, pointed to cases in which courts have nullified contracts made in violation of the Public Bid Law to argue that the *Airline* holding is inapplicable to an imprescriptible nullity. 15-569 at *14, 186 So.3d at 1218. However, the *Executone* court distinguished those cases as follows:

> We recognize that the cases cited by [Plaintiff] do in fact nullify contracts entered into by unlicensed contractors, even after they were completed, based on claims pursued under La. C.C. arts. 7 and 2030. However, these cases are distinguishable from the present case because they all involved actions for nullity brought by parties to the contracts. In the present case, [Plaintiff] is not a party to the contract sought to be annulled… the timeliness standard associated with [Plaintiff's] claims against defendants brought pursuant to the public bid law also applies to [Plaintiff's] nullity claim against these same defendants.

*Id.* at *14—15, 186 So.3d at 1219. Such is the case here. Surely the Louisiana Supreme Court was mindful of Civil Code articles 7 and 2032 at the time it rendered its ruling in *Airline*, and did not intend for its holding to conflict with existing legislation. The rationale of *Executone* reconciles the holding of *Airline* with the mandate of Articles 7 and 2032. Accordingly, as a nonparty to the contract it seeks to annul, Plaintiff's claim of nullity is bound by the timeliness constraints of *Airline*, and is untimely.

Finally, because the Court finds that additional discovery will not change the Court's Ruling that Plaintiff untimely filed for injunctive relief, it denies Plaintiff's request for a 56(d) delay.

## V.      Conclusion

Accordingly, based on the foregoing,

**IT IS ORDERED** that Defendant's Motion to Dismiss (Doc. 15), converted by this Court to a Motion for Summary Judgment, is **GRANTED**.

**IT IS FUTHER ORDERED** that all claims against Defendant are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Preliminary Injunction (Doc. 6) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's request for a Rule 56(d) delay, as contained in Doc. 43-1, is **DENIED.**

Signed in Baton Rouge, Louisiana, on <u>November 29, 2016</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**